AMERICAN HEARING
AID ASSOCIATES,
INC., Plaintiff,

v.

GN ReSOUND NORTH AMERICA,
t/a GN ReSound Corporation,
Defendant.

Civil Action No. 01–5404.

United States District Court,
E.D. Pennsylvania.

March 22, 2004.

---

James A. Keller, William M. Janssen, Saul Ewing LLP, Philadelphia, PA, for Plaintiff.

Leigh W. Marquardt, Nicholas M. Centrella, Conrad, O'Brien, Gellman & Rohn P.C., Philadelphia, PA, Steven T. Whitmer, Terrence P. Canade, Lord, Bissel & Brook LLP, Chicago, IL, for Defendant.

## MEMORANDUM

ROBERT F. KELLY, Senior District Judge.

Presently pending before this Court is the Motion for Summary Judgment of Defendant GN ReSound North America, t/a GN ReSound Corporation ("GN"). For the following reasons, GN's Motion will be granted.

## I. BACKGROUND

American Hearing Aid Associates, Inc. ("AHAA") filed a Complaint against GN on October 25, 2001. The eight-Count Com-

plaint set forth claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), intentional interference with existing contractual relations (Count III), intentional interference with prospective economic advantage (Count IV), negligent interference with prospective economic advantage (Count V), improper interference with contract (Count VI), unjust enrichment (Count VII) and conversion (Count VIII). At this stage in the litigation, the only Counts remaining are the claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II) and conversion (Count VIII).[1] AHAA's claims are based on a business relationship between the parties that soured over a competition for customers.

AHAA is a national hearing health care network of associates that is comprised of independent hearing health care professionals (i.e. audiologists, hearing aid dispensers, otolaryngologists, etc.). AHAA offers a variety of services and incentives to AHAA Associates [2] in order to maintain its extensive network. For example, AHAA has developed business relationships with manufacturers and suppliers of hearing equipment and devices in order to provide valuable benefits to AHAA Associates. "Once affiliated with [AHAA], Associates are eligible to purchase hearing health care equipment and devices through AHAA at substantial price discounts due to AHAA's ability to purchase such equipment and devices in significantly greater volumes than the Associates would be able to purchase independently." (Compl.¶ 10).

In order to obtain volume discounts, AHAA contracts with manufacturers and suppliers of hearing equipment and devices. The manufacturers and suppliers benefit from these contracts because they obtain, through AHAA, access to AHAA's national network of associates. Along with the volume discounts, manufacturers and suppliers often offer bonuses and other incentives to AHAA based on the number of purchases these AHAA network members make through AHAA. These contractual incentives encourage AHAA to persuade AHAA Associates to order equipment and devices from these network affiliated manufacturers and suppliers in large volumes.

Outside of a membership fee of $150, AHAA does not charge its members for many of the consultative and guidance services it provides. AHAA Associates pay for services by making purchases through the AHAA network. In turn, AHAA is compensated through the deep discounts (AHAA retains a portion of any discount as profit) and other incentives it receives from contracting manufacturers and suppliers.

GN is a global manufacturer of hearing health care equipment and devices. Specifically, GN is one of the world's largest manufacturers of hearing aids. GN sells its products through two different avenues. First, GN maintains its own sales force throughout the United States and sells its products directly to health care professionals. Second, GN works with "buying groups," such as AHAA, to enhance product sales to these professionals. The claims in the instant case center around these two sales routes.

AHAA has contracted with GN (or it predecessor) [3] since 1998 through a series

---

1. In its response to the instant Motion, AHAA has voluntarily dismissed Counts III, IV, V, VI and VII.

2. These AHAA Associates are alternatively referred to as "members."

3. GN was formed when two hearing aid businesses, GN Danavox and ReSound Corporation, merged in July of 1999.

of agreements that have ranged from one year to three years in duration. Each contract gave GN the right to sell its products through AHAA to AHAA Associates. Moreover, each contract compensated AHAA through discounts on the purchase of GN products by AHAA Associates. Finally, by offering financial rewards, the contracts encouraged AHAA to utilize its sales force to meet certain volume sales targets in relation to GN products.

This current lawsuit arises out of a contract that GN and AHAA entered into in May 2000 and amended in May 2001 (collectively the "Contract").[4] The Contract outlines that "[GN] manufactures and distributes a number of different models of hearing instruments" and that AHAA "is in the business of distributing and/or selling hearing instruments." (Pl.'s Mem. Opp. Summ. J., Ex. 4). In terms of the relationship of the parties established by this Contract, the agreement states that "the parties to this [Contract] are independent contractors, and nothing in this [Contract] is intended to create any relationship of partnership, joint venture, employment, franchise, or agency between the parties." (Id.). The Contract states that the parties purpose is "to enter into an agreement pursuant to which [AHAA] may purchase hearing instruments from [GN] for resale." (Id.). The agreement specifically acknowledges that AHAA is a "member-based organization" and that AHAA Associates "are entitled to purchase from [GN] through [AHAA]."[5] (Id., Ex. 5). As previously described, the Contract also outlines the compensation that AHAA would receive from the arrangement through discounts on GN products and volume-based sales incentives (i.e. rebates).[6] (Id.).

In June and July 2001, the relationship between GN and AHAA began to deteriorate. Specifically, GN began to formulate a plan that would allow it to bypass AHAA and the AHAA network when making future sales to health care professionals. GN came to the conclusion that it would make better economic sense for it to sell its health care equipment and devices directly to health care professionals rather than through AHAA. This formulated plan was called the "AHAA Exit Strategy" by upper-level GN employees.[7] (Jackson Dep. at 148). The plan called for the GN sales force to approach AHAA Associates and encourage them to begin to purchase

---

4. The main purposes of the May 2001 amendment was to do the following: a) increase the term of the Contract from one to three years; b) increase the discount rate that GN provided; and c) alter the rebate conditions. The termination date of the Contract is April 30, 2004.

5. For the sake of clarity, it should be noted that the Contract obligated AHAA (and not AHAA Associates) to pay GN for all the GN products ordered by AHAA Associates through the network. Thus, AHAA paid GN and AHAA would then seek reimbursement from its members.

6. The compensation AHAA received through discounts is alternatively referred to as "margin." For example, in terms of the compensation through discounts, the Contract provides that "all AHAA members would receive a 24% discount from AHAA, and AHAA, in turn, would receive a 48% discount from GN (the difference between the 24% and 48% constituting AHAA's margin)." (Pl.'s Mem. Opp. Summ. J. at 12). In relation to compensation by rebates, the Contract indicates that AHAA receives a rebate on the purchase of "digital and digitally programmable units" when the number of such units sold reaches 20,000 during a 12–month period, with an additional rebate offered as an incentive to AHAA if it met the 25,000 unit threshold. (Id.). Thus, under the terms of the Contract, AHAA was to be compensated through discounts and rebates when GN sold products through AHAA.

7. This Court will also refer to this plan and course of action as the "AHAA Exit Strategy."

GN products directly from GN rather than through AHAA. Notably, many of these members had previously purchased products directly from GN. The foundation of GN's plan to change the purchasing method of AHAA Associates was to undercut the prices that AHAA was offering for GN products and to offer other various promotions to these buyers. This "AHAA Exit Strategy" was to be coordinated from GN headquarters in Minnesota and the entire plan was to be kept secret from AHAA.[8] As conceded by GN, the ultimate goal of the "AHAA Exit Strategy" was to "take as many accounts away from AHAA as possible." (Pl.'s Mot. Opp. Summ. J. at 26).

In September 2001, GN put the "AHAA Exit Strategy" into action. The GN sales force approached AHAA Associates and numerous AHAA Associates switched to a direct purchasing line with GN. Thus, these customers began bypassing the AHAA network when they made their purchases from GN. AHAA alleges this conduct resulted in a substantial loss of revenue and damaged its relationship with both existing and prospective AHAA Associates.

Significantly, for purposes of AHAA's claims, AHAA alleges that customer lists it sent to GN pursuant to the Contract were improperly used by GN to convert AHAA Associates to a direct purchasing line. Moreover, AHAA alleges that GN sent customer lists to one of AHAA's competitors in an attempt to take additional business away from AHAA.[9] GN's use of these customers lists is the basis for AHAA's conversion claim.

AHAA filed its eight-Count Complaint on October 25, 2001. In Response to the instant Motion, AHAA has voluntarily dismissed the majority of its claims. The only Counts remaining are its claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II) and conversion (Count VIII). GN filed this Motion for Summary Judgment on January 13, 2004. GN argues that there are no disputed issues of material fact and that all of AHAA's claims fail as a matter of law.[10] Moreover, as part of the instant Motion, GN requests that this Court award it attorneys' fees pursuant to a provision in the parties' Contract that states the prevailing party in any litigation can recover attorneys fees.[11] On February 10, 2004, AHAA filed its Response to the current Motion. Further, on February 24, 2004, GN filed a Reply in support of its Motion. Finally, on March 3, 2004, AHAA filed a Sur–Reply in regards to GN's Motion.

## II. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter

---

8. GN instructed its sales force to encourage AHAA Associates to sign confidentiality agreements if they elected to switch to a direct line of purchasing.

9. AHAA states it was contractually compelled to provide GN with customer lists for administrative purposes. AHAA alleges that GN sent these customer lists to a competitor "buying group" named Sonus.

10. For purposes of the Court's disposition of the instant Motion, GN stipulates to each and every fact of AHAA's Response to the Motion. However, GN does not stipulate to the adjectives that AHAA used in its factual description.

11. The Contract provides that "[i]f litigation occurs between the parties in connection with this Agreement, the prevailing party will be entitled to its reasonable attorneys' fees, expert witness fees and costs of suit." (Pl.'s Mem. Opp. Summ. J., Ex. 4).

of law." FED.R.CIV.P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. 2505.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester,* 891 F.2d 458, 460 (3d Cir.1989)(citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548 (1986)). Further, the non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. *Id.* at 322, 106 S.Ct. 2548; *Wisniewski v. Johns–Manville Corp.,* 812 F.2d 81, 83 (3d Cir. 1987).

## III. DISCUSSION

GN argues that AHAA's remaining claims of breach of contract, breach of the implied covenant of good faith and fair dealing and conversion are ripe for summary judgment. The Court will now address each of these claims in light of the applicable summary judgment standard.

### A. Breach of Contract Claim

■ AHAA's first claim is that GN breached the Contract between the parties. AHAA is clear that its breach of contract claim is based on GN's alleged breach of an *express* contractual provision. AHAA has been less than clear, however, in stating precisely which contractual provision(s) in the Contract GN has allegedly breached. AHAA's general claim under this cause of action is that GN breached the Contract through its coordinated effort to "actively pursue AHAA members for the express purpose of taking margin and rebate volumes away from AHAA." (Pl.'s Mem. Opp. Summ. J. at 56–57). In its Sur–Reply, AHAA narrows its claim somewhat by stating that "by deliberatively (and secretly) working to switch the purchasing method of AHAA 'members,' this intentional conduct breached GN's explicit promise to pay AHAA for all its 'member' purchases for the duration of the contract." (Pl.'s Sur–Reply Br. at 2). In sum, AHAA's breach of contract claim is premised on the breach of a promise to pay margin and rebate on AHAA Associate purchases. In response, GN simply argues that there is no contractual provision that prohibits it from approaching AHAA Associates and convincing them to change their purchasing arrangements. This Court agrees with GN and finds that there are no genuine issues of material fact that surround this claim and that the claim fails as a matter of law.

According to California law, "[t]o be entitled to damages for breach of contract, a plaintiff must plead and prove (1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) *defendant's breach*, and (4) damage to plaintiff." [12] *Walsh v. W. Valley Mission Cmty. College Dist.*, 66 Cal.App.4th 1532, 78 Cal.Rptr.2d 725, 733 (1998)(emphasis added). In the instant case, as GN emphasizes, AHAA has not presented sufficient evidence to reach the trial stage relating to its claim that GN breached the Contract when it approached AHAA Associates and convinced them to alter their purchasing methods. Thus, AHAA has failed to establish the third prong of a *prima facie* breach of contract case pursuant to California law.

AHAA's breach of contract claim is essentially based on GN's promise to pay AHAA (through margin and rebates) for the duration of the three-year contract when AHAA Associates made purchases of GN products. AHAA claims that GN breached this covenant when it convinced AHAA Associates to bypass the AHAA network and purchase GN products directly from GN. Essentially, AHAA is alleging that GN's conduct was a breach of contract because it stripped AHAA of the benefits it was entitled to receive (i.e. margin and rebates) when AHAA members made purchases of GN products.

The specific provisions in the Contract that deal with the issues of margins, rebates and the description of AHAA Associates demonstrate the baselessness of AHAA's breach of contract claim. Specifically, it is what these contractual provisions fail to say that supports the proposition that this claim is ripe for summary judgment. The Court will first outline the critical contractual provisions that AHAA appears to allude to in support of its argument. Next, the Court will analyze these provisions to show why AHAA's breach of contract claim must fail at this summary judgment stage of the litigation.

First, the Contract specifically describes an AHAA Associate ("Customer Member") as follows:

[AHAA] is a member-based organization. *[AHAA]'s members are entitled to purchase from [GN] through [AHAA]*. [GN] will send invoices to [AHAA] for [GN] Products purchased which invoices will reflect the list price less the discount.... [AHAA] shall provide to [GN] a list of its members and shall update it regularly with any changes. [GN] will not be required to process orders from any entity or person until [AHAA] has advised [GN] that such entity or person is a member of [AHAA].

(Pl.'s Mem. Opp. Summ. J., Ex. 5)(emphasis added). Second, in relation to margins, the Contract states that "[AHAA Associates] will receive from [AHAA] a 24% discount off the list price as reflected on the Price List and with respect to orders from [AHAA Associates] [AHAA] will be billed by [GN] at a 48% discount off the list price as reflected on the Price List." (*Id.*). Third, in relation to rebates, the Contract provides that "[f]or [GN] Products listed on the Price List that are *ordered by [AHAA]* during the twelve (12) month period commencing on June 1, 2001 and each succeeding twelve (12) month period during the term of the Agreement, [AHAA] shall be entitled to a rebate as follows...." (*Id.*)(emphasis added). AHAA

---

12. Both parties agree that California law applies to both the breach of contract and breach of the implied covenant of good faith and fair dealing claims pursuant to the Contract's choice of law provision. The choice of law provision states that the "Agreement is governed by the laws of California, without regard to or application of its laws relating to conflicts of law." (Pl.'s Mem. Opp. Summ. J., Ex. 4).

directs this Court to the above contractual provisions and its overall breach of contract argument when it states in its Response the following:

> Quite simply, it is impossible to interpret GN's contract in any way *other* than how AHAA interprets it—AHAA had covenanted with GN to have the AHAA membership purchase GN units through AHAA, and for each unit purchased by an AHAA member, AHAA would receive the margin discount and the back-end rebate earned by those sales. GN had no legal right under the express terms of its contract to sidestep this arrangement, approach AHAA members, and have them change their purchase arrangement-*after* becoming an AHAA member-in order to avoid paying AHAA its otherwise earned margin and discount.

(Pl's Mem. Opp. Summ. J. at 58).

There are numerous ways in which these contractual provisions display how AHAA's breach of contract claim lacks merit. As an initial matter, and most importantly, there is no contractual provision or language cited by AHAA (or found by this Court) that prohibits GN from approaching AHAA members and persuading them to alter their purchasing arrangement to a direct channel with GN. As GN emphasizes, "[t]he relevant inquiry is not whether the Contract *permits* GN to 'approach AHAA members, and have them change their purchase arrangement,' but whether the Contract *prohibits* GN from doing so." (Def.'s Reply Br. at 2). There was simply no provision in the Contract that explicitly prohibited GN's conduct that would support an *express* breach of contract claim.

The contractual provisions outlined above do nothing to support AHAA's argument. In fact, in many ways, these provisions cut against its breach of contract claim. The provision defining an AHAA Associate states that "[AHAA]'s members are entitled to purchase from [GN] through [AHAA]." (Pl.'s Mem. Opp. Summ. J., Ex. 5). Notably, this provision does not mandate that AHAA Associates only purchase GN products through AHAA. AHAA and GN clearly did not agree to an exclusive contact where GN could sell products to AHAA Associates only through the AHAA channel. Moreover, in relation to the provision dealing with margins, the contractual provision clearly displays that AHAA would only receive a financial benefit as a result of a sale if AHAA was involved in the transaction. Finally, in relation to the rebate provision referred to by AHAA, AHAA is only entitled to a rebate "[f]or [GN] Products listed on the Price List that are *ordered by [AHAA].* ..." (*Id.*)(emphasis added). Clearly, these rebate entitlements do not apply when GN sells products directly to AHAA Associates because AHAA would not have ordered the products on behalf of any members.

In sum, GN has directed this Court to the fact that AHAA has no contractual provision to support its breach of contract claim. In turn, AHAA has not produced sufficient evidence at this summary judgment stage to show that its breach of contract claim should survive. Specifically, there is no contractual provision in the Contract that prohibits GN from approaching AHAA Associates and persuading them to switch from the indirect AHAA purchasing channel to the direct GN channel. GN was simply acting to protect is own financial interest and there was no provision in the Contract that prohibited this conduct even if it did have a negative impact on AHAA's business. Moreover, the contractual provisions that AHAA directs this Court to do not support its breach of contract claim. These contractual provisions outline what AHAA was entitled to when it was involved in a sale of GN products. There is no evidence that

GN did not compensate AHAA pursuant to the Contract when AHAA was used as a conduit in a sale. AHAA has attempted to create an express breach of contract cause of action when there is no contractual provision that supports its claim. This Court finds that summary judgment in GN's favor is appropriate regarding the breach of contract claim.

## B. Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

■ AHAA's second remaining claim is that GN breached the implied covenant of good faith and fair dealing through its conduct. AHAA's argument is that GN breached this covenant when it frustrated AHAA's ability to earn contracted-for discount margins and rebates when it persuaded AHAA Associates to alter their purchasing methods. As will be discussed, this claim must also be dismissed at the summary judgment stage because GN's conduct did not breach any contractual provision. The applicable law is clear that this type of implied covenant claim cannot impose substantive duties or limits on a contracting party beyond those in the relevant agreement. AHAA's claim fails because it attempts to limit GN's conduct in a manner not reflected in the Contract.

■ Pursuant to California law, the implied covenant of good faith and fair dealing is implied by law in every contract and it exists to prevent one contracting party from unfairly frustrating the other party's entitlement to benefits pursuant to the contracting parties' agreement. *Guz v. Bechtel Nat'l Inc.*, 24 Cal.4th 317, 100 Cal. Rptr.2d 352, 8 P.3d 1089, 1110 (2000). In other words, "the implied covenant imposes upon each party the obligation to do everything that the contract presupposes they will do to accomplish its purpose." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal.App.3d 1371, 272 Cal.Rptr.

387, 398 (1990)(quoting *Schoolcraft v. Ross*, 81 Cal.App.3d 75, 146 Cal.Rptr. 57 (1978)). In the instant case, AHAA's argument is that GN's conduct gave rise to a claim because it frustrated AHAA's ability to obtain "contracted-for financial benefits." (Pl.'s Mem. Opp. Summ. J. at 53).

■ The law is clear in California that AHAA's implied covenant of good faith and fair dealing claim must fail since this Court has found that GN did not breach any contractual provision when it put the "AHAA Exit Strategy" into action. The California Supreme Court has emphasized that this covenant cannot "be endowed with an existence independent of its contractual underpinnings." *Guz*, 100 Cal. Rptr.2d 352, 8 P.3d at 1110 (quoting *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 44 Cal.Rptr.2d 370, 900 P.2d 619, 639 (1995)). In other words, the covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of the agreement." *Id.* More specifically, as one California court described:

'[t]he covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes.' In short, it is an implied-in-law term of the contract. Therefore, its breach will always result in a breach of the contract, although a breach of a consensual (i.e. express or implied-in-fact) contract term will not necessarily constitute a breach of covenant.

*Careau & Co.*, 272 Cal.Rptr. at 398–99 (quoting *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 394 (1988)). As another California court noted, "if there exists a contractual relationship between the parties ... the implied covenant is limited to assuring compliance with the express terms of the

contract, and cannot be extended to create obligations not contemplated in the contract." *L.A. Equestrian Ctr., Inc. v. City of L.A.*, 17 Cal.App.4th 432, 21 Cal.Rptr.2d 313, 323 (1993)(quoting *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal.App.4th 1026, 14 Cal.Rptr.2d 335 (1992)).

As previously discussed, this Court will dismiss AHAA's breach of contract claim because the evidence shows that GN complied with all relevant contractual provisions. Thus, according to the law cited above, AHAA's breach of the implied covenant of good faith and fair dealing claim must also be dismissed because AHAA is attempting (through the claim) to add substantive limits on GN's conduct that were not reflected in the Contract. As noted, this covenant is "limited to assuring compliance with the express terms of the contract." *Id.* This Court has determined that GN was within the bounds of the contract when it approached AHAA Associates and persuaded them to alter their purchasing methods. Thus, GN cannot be held liable for this implied covenant claim since the cause of action is limited to assuring compliance with the contract. This claim cannot be used to add substantive limits on GN's conduct that were not spelled out in the written Contract. GN did not breach the express terms of the contract, therefore, it did not breach the implied covenant at issue. This Court finds that summary judgment in GN's favor is appropriate regarding the breach of the implied covenant of good faith and fair dealing claim.

## C. Conversion Claim

■ AHAA's third remaining claim is one of conversion against GN. The substance of AHAA's conversion claim has been ambiguous throughout the litigation.[13] Nevertheless, AHAA's claim now appears to be focused on GN's alleged conversion of customer lists that belonged to AHAA. Specifically, AHAA alleges that GN took customers lists that AHAA provided to GN pursuant to the Contract and used these lists for their own self-interest to convert AHAA Associates to a direct purchasing method. Moreover, AHAA alleges that GN transmitted these lists to Sonus, a competitor of AHAA, in an attempt to harm AHAA's business. AHAA's conversion claim will also be dismissed at this stage because it fails pursuant to the applicable law.

■ Unlike the other two claims previously discussed in this Memorandum, this conversion cause of action qualifies as a tort claim as opposed to a contract claim. The preliminary question is whether the choice of law provision in the Contract mandates that California law apply to the conversion claim or whether another state's law applies. Both parties cite Pennsylvania law in regards to the conversion claim. This Court agrees that Pennsylvania law applies to the conversion claim because the choice of law provision is not broad enough to cover this tort claim and because the forum law of Pennsylvania regarding conversion does not conflict with any other relevant state's law.[14]

---

**13.** In the Complaint, AHAA's conversion claim stated that "GN wrongfully converted AHAA's property rights in its network of Associates, and ha[d] done so for GN's own use and benefit." (Compl.¶ 89). In its Response to the current Motion, AHAA focuses its argument on GN's alleged improper use of AHAA customer lists.

**14.** GN explicitly states that Pennsylvania law applies to the conversion claim because of the narrow scope of the choice of law provision and the fact that it is unaware of Pennsylvania law conflicting with any other relevant state's law in this area. AHAA simply cites Pennsylvania law relating to conversion and does not provide any conflicting state law. As previously noted, the choice of law provision

■ According to Pennsylvania law, conversion is the "deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir.1995). In this case, AHAA's conversion claim is two-fold. First, AHAA alleges that GN misappropriated customer lists that AHAA was obligated to provide GN for administrative purposes (i.e. shipping purposes) pursuant to the Contract. Specifically, AHAA contends GN used these customer lists improperly by using them as a tool to target AHAA Associates and switch their purchasing methods. Second, AHAA alleges that GN is liable for conversion because it transmitted these customer lists to a competitor of AHAA (Sonus) in attempt to harm AHAA's business.

■ AHAA's conversion claim is essentially that GN converted trade secrets through its conduct. Pennsylvania law does allow for trade secrets to be the subject of a conversion claim. *Air Prods. and Chem., Inc. v. Inter-Chem. Ltd.*, No. 03–6140, 2003 WL 22917491, at *12 (E.D.Pa. Dec.2, 2003). Moreover, confidential customer lists have qualified as trade secrets pursuant to Pennsylvania law. *Nat'l Risk Mgmt., Inc. v. Bramwell*, 819 F.Supp. 417, 430 (E.D.Pa.1993). "In

order to succeed on his or her conversion claim a plaintiff must prove that: '(1) *he or she owns a trade secret;* (2) the trade secret was communicated to the defendant within a confidential relationship; and (3) the defendant used the trade secret to the plaintiff's detriment.'" *Id.* (quoting *Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc.*, No. 00–3683, 2001 WL 856946, at *8 (E.D.Pa. July 26, 2001))(emphasis added).

■ AHAA's claim fails because it has not established that the customer lists at issue qualified as trade secrets. Pursuant to Pennsylvania law, "a trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Air Prods. and Chem., Inc.*, 2003 WL 22917491, at *9 (quoting Restatement (First) of Torts § 474 cmt. b). The critical factors in determining whether information qualifies as a trade secret are "substantial secrecy and competitive value to the owner." *Id.* Significantly, "customer lists and confidential business information ... cannot be trade secrets if they are easily or readily obtained, without great difficulty, through some independent source other than the trade secret holder." *Nat'l Risk Mgmt., Inc.*, 819 F.Supp. at 431.

in the Contract stated that "[t]his Agreement is governed by the laws of California, without regard to or application of its laws relating to conflicts of law." (Pl.'s Mem. Opp. Summ. J., Ex. 4). "Courts analyze choice of law provisions to 'determine, based on their narrowness or breadth, whether the parties intended to encompass all elements of their association.'" *Jiffy Lube Int'l, Inc., v. Jiffy Lube of Pa., Inc.*, 848 F.Supp. 569, 575 (E.D.Pa.1994)(quoting *Composiflex, Inc. v. Advanced Cardiovascular Sys., Inc.*, 795 F.Supp. 151, 157 (W.D.Pa.1992)). Moreover, "narrow choice of law provisions are generally held insufficient to encompass the contracting par-

ties' tort claims." *AAMCO Transmissions, Inc. v. Marino*, No. 88–5522, 1992 WL 38120, at *6 n. 15 (E.D.Pa. Feb.20, 1993). In the instant case, this Court finds the narrow language of the parties' choice of law, restricting its scope to "this agreement," mandates that the California choice of law provision only controls the construction, interpretation and enforcement of the Contract. Thus, the choice of law provision does not govern AHAA's tortious conversion claim. This Court will apply the forum law of Pennsylvania, since as the parties agree, there are no apparent conflicts with Pennsylvania law and the law of any relevant states.

In the instant case, AHAA has not produced sufficient evidence at this summary judgment stage to show that the customer lists it provided to GN (which GN allegedly misused) qualified as trade secrets because they were substantially secret. Instead, the record displays that a list of AHAA Associates is readily available on the Internet at AHAA's website. AHAA's President and an AHAA employee admitted this fact in their deposition testimony. (Urwin Dep. at 120; Russomagno Dep. at 172). Thus, customer lists that AHAA provided to GN cannot be the subject of a conversion claim because they are not confidential and are, in fact, available to the public, including AHAA competitors.[15] *Id.* ("[C]ourts have denied protection to customer lists which are easily generated from trade journals, ordinary telephone listings, or an employee's general knowledge of who, in an established industry, is a potential customer for a given product."). AHAA's conversion claims fails as a matter of law and GN is entitled to summary judgment in its favor regarding this claim.

## IV. CONCLUSION

For the reasons set forth above, this Court finds that AHAA's remaining claims for breach of contract, breach of the implied covenant of good faith and fair dealing and conversion should be dismissed at this summary judgment stage. There are no genuine issues of fact surrounding any of AHAA's remaining claims and GN is entitled to judgment as a matter of law on all these claims. Accordingly, the Court will grant GN's Motion for Summary Judgment.[16]

An appropriate Order follows.

---

**15.** In its Sur–Reply, AHAA attempts to save its claim by arguing that some of the information contained in the customer lists it sent to GN was confidential and not available on the Internet. Nevertheless, in regards to its two-fold conversion claim, AHAA has not produced sufficient evidence to survive summary

judgment to show how GN allegedly misappropriated some confidential information that was a part of the customers lists.

**16.** This Court will address GN's request for attorneys' fees in the attached Order.

## ORDER

**AND NOW,** this 22nd day of March, 2004, upon consideration of Defendant's Motion for Summary Judgment (Doc. No. 42), and the Responses and Replies thereto, it is hereby **ORDERED** that:

1. Defendant's Motion for Summary Judgment is **GRANTED;** and

2. Plaintiff and Defendant are directed to submit additional briefing on the issue of attorneys' fees within thirty (30) days from the date of this Order. Further, Defendant is directed to submit affidavits and any additional evidence that supports the reasonableness of the rates and hours that encompass its request for attorneys' fees. Finally, the parties should inform the Court if they anticipate that an evidentiary hearing will be necessary regarding Defendant's request for attorneys' fees.